**Leedert HEUVAL, Libelant,**

v.

**THE BARGES Z408 and 463, their tackle, apparel, furniture, etc., Charles Zubik, Respondent, Charles Zubik & Sons, Inc., Respondent, all persons intervening for their interests therein, Respondent.**

No. 251.

United States District Court
W. D. Pennsylvania.

March 1, 1956.

Ralph Davis, Jr. (of Evans, Ivory & Evans), Pittsburgh, Pa., for libellant.

Harland I. Casteel (of Campbell, Houck & Thomas), Pittsburgh, Pa., for respondent.

MARSH, District Judge.

Libelant claims he saved two barges and a cargo of 600 tons of coal from impending peril or loss, and brings this action for a salvage award.[1] The court has jurisdiction in admiralty of the parties and cause of action.[2]

---

1. The transcript was ordered by the court December 7, 1954 and was received February 9, 1956.

2. The proof failed to show that Charles Zubik & Sons, Inc., was in any way interested in or connected with the barges or the cargo.

On September 17, 1953, two steel barges Z408 and 463 had been chartered by Charles Zubik, their owner, to V. P. Serodino, Inc., and were in the sole and exclusive care, custody and control of the charteree.

On that day, about 12:30 o'clock P.M., these barges slipped from their moorings at the Serodino loading dock near the Village of Guild, Marion County, Tennessee, on the Tennessee River, a navigable river with a 9-foot navigable channel.

One end of barge Z408 was loaded with 600 tons of coal worth $2,550; the other barge was empty. Each was 175 feet long, 26 feet wide, and 11 feet deep. They were lashed together abreast as they started to drift. No proof was offered of their value.[3]

Libelant, Leedert Heuval, owned an all-steel, twin-screw, cabin cruiser "Rob-Marie", 46 feet long and 12 feet wide at the stern; two marine motors, each of 100 horsepower, provided the power. The approximate value of this craft was $5,000.

The Serodino loading dock was situated about 300 feet upstream from the river dock where Heuval's cruiser was moored; both docks were on the left downstream side of the river.

At the time aforementioned the river was in a low pool stage. The current was slowly flowing at a speed estimated on behalf of respondents at 1¼ to 1½ and by libelant at 3 to 4 miles per hour. The weather was fair and calm. The river in the vicinity varied from 600 to 775 feet wide. The navigable channel was located nearer to the right bank looking downstream.

When the barges broke away, Raymond Barber, an employee of the charteree, boarded them. He promptly called a warning to libelant and others who were at libelant's river dock. The libelant, upon being alerted and believing that Barber also asked for help, immediately put out in the "Rob-Marie" to the rescue. Aboard were Albert McRae, a house guest of libelant, and one Curt Pyburn, a former deckhand of 3-months' experience. Also putting out from this dock in their outboard motors were Roy Ralston and Arnold Young.

Neither side produced Pyburn, Ralston, or Young as witnesses nor took their depositions, thus requiring the court to find the facts from the testimony of Heuval and his guest McRae on the one side, and the testimony of Barber, William Pachoud, a foreman of V. P. Serodino, Inc., and Charles Zubik, respondent, on the other side; all of these witnesses were partial and interested. Many of the factual details and opinions of those on one side were gainsaid by those on the other.

Substantial agreement, however, is found as to the following facts. Libelant, in an effort to capture the drifting barges and tow them back to the loading dock, cruised alongside and Pyburn threw a one-half inch hemp line over a timberhead on the partially loaded barge. At this point the lashed barges were drifting downstream broadside with the loaded barge on the downstream side. The hemp line used parted several times. A heavier line was secured[4] and made fast to the head of the loaded barge. Although this line was of sufficient strength, libelant was unable to tow the barges upstream; at most he was able to retard their progress downstream for a period of time.

When he finally realized the futility of pulling against the current, libelant severed the barges in order to beach them separately, as he says, "because I know

---

3. Interrogatories relating to the purchase price of each barge in 1950 were not offered in evidence.

4. There is disagreement as to where this line came from. Respondents' witnesses state it was obtained by Arnold Young from the Serodino dock; Barber said it was 40 feet long (T. 162); Pachoud said it was 100 feet long (T. 172); libelant says one of the 30 foot lines lashing the barges together at their heads was untied and used (T. 23).

there are rocks on the bank and if I were to let the two of them go together the weight of the loaded barge might have punched a hole into the empty barge, especially when it hit the shore." The cruiser towed or pushed the barges individually to safety on opposite shores. The empty barge was secured on the right-hand shore about 1 mile and the loaded barge on the left-hand shore about $1\frac{1}{4}$ miles from the loading dock. Later they were picked up undamaged by Serodino's towboat.

There was no contention or evidence that Serodino's employees (Barber on the barges and Pachoud at the loading dock) protested against libelant's efforts to recapture the barges and tow them back to their dock; in fact, Barber, at least tacitly, accepted the help offered and participated in untying the lines lashing the barges together.

Libelant's maneuver in separating the barges is the only impressive evidence of especial judgment and skill on his part to save the barges from possible damage and danger of sinking. This operation was premised on his belief that rocks were present on the shores, which fact is sharply disputed. However, respondent's witness, Barber, agrees that there were rock hazards downstream and that "we got stopped in time" (T. 127).

The evidence is contradictory as to the other facts litigated. I find, however, that libelant prior to separating the barges was towing them diagonally downstream towards the right shore, and had developed momentum sufficient to enable the empty to drift to that shore after it was cut loose. There Ralston in his outboard was able to hold it. Libelant then pulled or pushed the loaded barge with the aid of the current toward the left shore at the bend in the river, where it was tied to a tree by Pyburn. The time consumed by libelant in his ef-

forts was about 3 hours. I further find that rocks and other hazards [5] existed along the downstream shore lines of the river for several miles, but that their exact locations were unknown to libelant; that the barges were beached undamaged was a consequence of chance and not of skill.

Both Heuval and Charles Zubik are experienced seamen of expert status, but they disagreed on whether the drifting barges were in peril and a menace to navigation. Heuval was of the opinion that they would have drifted in the navigable channel and endangered the river traffic; and when they reached the bluffs and "dredged channel" they would have collided with rocks and sunk, closing the river to navigation. Zubik was of the opinion that they would have drifted to the shore at the bend in the river at just about the place where the loaded barge was actually beached. He contends libelant's efforts accomplished nothing more than the river current itself would have accomplished.

Bearing upon libelant's judgment is the fact that early in the rescue effort the barges drifted onto a sandbar about one tenth of a mile from the loading dock. Pachoud for respondents contends that libelant could and should have held them there until the Company's towboat arrived, for to have done so would have been without risk of damage to the cruiser or the barges. But instead libelant pulled them off the sandbar toward midstream after which they were separately beached as above described. Since libelant should have known by that time that he could not tow the barges upstream, it is questionable whether he exercised good judgment in dislodging them from the sandbar.

No peril to life or limb was shown in the operation. The cruiser sustained damage to its running lights, air vents,

5. See respondent's Exhibit "B" wherein the dots indicate tree stumps and other hazards. There are dots near where the loaded barge was beached. This exhibit is a navigation chart of the Tennessee River published by the Tennessee Valley Authority in 1954. The hazards are located between 85° 34′ W, 35° 7′ N, and 85° 35′ W, 35° 6′ N. It is similarly located on a 1946 map identified as libelant's Exhibit No. 1.

rudder stocks and burned out one motor in beaching the loaded barge. The reasonable costs of repair amount to $308.14.

The barges, as they drifted slowly with the current in daylight, to a slight extent constituted a hazard to navigation, and to a slightly greater extent were in peril of colliding with rocks or other hazards and sinking. Certainty or imminence of their damage and destruction but for libelant's intervention cannot be found from the weight of the evidence. Libelant was unsuccessful in his effort to return them to their dock; his judgment in halting their progress downstream does not appear to have been of the best. Nonetheless, by his prompt and voluntary but fruitless endeavor to return the barges to their dock, he displayed meritorious motive, determination and persistence. He entertained a reasonable apprehension of their safety, and conceived it to be his duty to attempt a rescue. In addition he exhibited skill and judgment in separating and maneuvering them to shore where they were tied up in safety. This conferred sufficient benefit upon the barges and their cargo to entitle him to a salvage award. But in these circumstances towing the barges to safety is regarded as a salvage service of a low order of merit and is to be compensated by a comparatively small award. 78 C.J.S., Salvage, § 126 (1952); citing Costanzo Transportation Co. v. American Barge Line Co., D.C.W.D.Pa. 1940, 35 F.Supp. 929; cf. Crescent Towing & Salvage Co. v. The MV 117, D.C.E. D.La.1949, 87 F.Supp. 257. The value of the cargo and cruiser, the damages to the cruiser and the time spent by libelant and his friends have been taken into consideration. I award to libelant the sum of $500.00, together with costs of suit.

The foregoing is intended to be the findings of fact and conclusions of law required under Admiralty Rule 46½, 28 U.S.C. Libelant shall submit an appropriate order within 10 days.